UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

QUINCY MUTUAL FIRE INSURANCE CO.

**COMPLAINT**

Plaintiff,

-vs-

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.

Case No. 3:12-CV-1041[NAM/DEP]

Defendant.

---

Plaintiff Quincy Mutual Fire Insurance Company ("Quincy") for their complaint against defendant New York Central Mutual Fire Insurance Company ("NY Central") states as follows:

## JURISDICTION AND VENUE

1.      This Court possesses jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), as this action is between a citizen of the state of Massachusetts and a citizen of the state of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because NY Central is subject to personal jurisdiction in this District and thus resides within this District.

## PARTIES

3.      Quincy is a corporation organized under the laws of the Commonwealth of Massachusetts and is authorized to conduct insurance business in the State of New York. Quincy's principal place of business is in Quincy, Massachusetts.

4.      Upon information and belief, NY Central is organized and existing under the laws of New York, and is licensed to conduct insurance business in the State of New York.  NY Central's office and principal place of business is located in Edmeston, New York.

## FACTUAL ALLEGATIONS

### The Insurance Policies

5.      Upon information and belief, NY Central issued to Randolph Warden ("Warden") in the State of New York Personal Automobile Liability Insurance Policy No. 7104220 ("NY Central Policy") for the period 8/11/2000 to 8/11/2001.

6.      Upon information and belief, pursuant to the terms of the NY Central Policy, NY Central undertook to pay on behalf of Warden those sums that Warden (the insured) becomes legally responsible to pay as damages because of bodily injury or property damage because of an auto accident up to the amount of $500,000 per accident.

7.      Upon information and belief, the NY Central policy included a "Supplementary Payments" provision obligating NY Central to pay interest accruing after entry of a judgment in any suit it defends in addition to its $500,000 limit of liability.

8.      Quincy issued to Warden Home Owners Policy No. HP 195802 ("Quincy Policy") for the period 7/29/2000 to 7/29/2001.

9.      Pursuant to the terms of the HO 440 Personal Umbrella Liability Endorsement in the Quincy Policy, Quincy undertook to pay that portion of the damages for personal injury or property damage for which Warden is legally responsible that exceeds the limits of any and all underlying auto bodily injury and property damage coverage maintained by Warden up to the amount of $1 Million for any one occurrence.

2

10.     Pursuant to the terms of the HO 440 Personal Umbrella Liability Endorsement, the umbrella coverage under Quincy Policy is excess to the NY Central Policy and is not triggered until the coverage extended under the NY Central Policy is exhausted.

**The Underlying Action and Claims**

11.     On November 21, 2000, Peggy Horton ("Horton") sustained catastrophic bodily injuries in a motor vehicle accident that occurred as a result of Warden's failure to yield the right of way at an intersection controlled by a stop sign in the Town of Ulysses, New York.

12.     In the fall of 2001, Horton, through her counsel, filed a civil action for personal injuries against Warden in the Supreme Court of Schuyler County.

13.     NY Central retained legal counsel to represent Warden ("Defense Counsel").

14.     NY Central informed Quincy that NY Central believed Horton's damages were within the limits of the $500,000 primary indemnity automobile policy Warden had purchased.

15.     The medical records produced in discovery reflect that Horton underwent a surgical fusion at the level of L4-L5 on October 11, 2001.  A second surgical procedure was performed on August 29, 2002 consisting of the insertion of percutaneous pedical screw instrumentation at the same level due to lumbar instability at the fusion site.   On October 28, 2002, Horton underwent a third surgical procedure involving a repair of a large ventral incisional hernia of her lower abdomen that developed after the October 2001 adnominal surgery to fuse her spine.

16.     At the request of the defense, Horton underwent an independent medical examination ("IME") on December 18, 2003 by a neurosurgeon, Anthony M. Avellanosa, M.D. In his report, Dr. Avellanos concluded that Horton sustained a radial tear and fissures of her L4-L5 disc as a direct result of the subject motor vehicle accident and that the surgical fusion

surgeries were medically necessary. Dr. Avellanos opined further that Horton's scar formation, surgical trauma, and surgical implantation will cause a significant and permanent disability. Finally, he concluded that Horton had not reached maximum medical improvement and that she will not be able to return to her job as a nurse.

17.     In the fall of 2004, Horton moved for summary judgment on the issue of both liability and the serious injury threshold.

18.     By letter dated November 4, 2004, Warden's counsel wrote to NY Central advising that he "expect[s] that liability would be assessed against our insured [Warden] at trial . . . even if we survive summary judgment."

19.     By decision and order dated May 18, 2005, the trial court granted summary judgment in favor of plaintiff on the issue of both liability and serious injury.

20.     As a result, Warden became legally obligated to pay interest at a rate of 9% per annum from the date of entry of the judgment determining liability.

**NY Central's Bad Faith Settlement Negotiations**

21.     Despite the fact that Warden's counsel acknowledged that the summary judgment determination was "expected," and that interest continued to accrue, NY Central authorized the appeal of the trial court's order granting summary judgment to the Appellate Division, Third Department.

22.     As a result of a mandatory settlement conference in January 2006, Horton's counsel advised that his client would settle the case for the $500,000 limits of the NY Central Policy, which was the only coverage disclosed by Warden's counsel in discovery.  NY Central rejected the demand, and extended an offer of $75,000.

23.     After Warden's insurance defense counsel disclosed the $1 Million umbrella coverage under the Quincy Policy, Plaintiff's Counsel withdrew his $500,000 demand and increased it to $1.5 Million.

24.     On August 3, 2006, the Appellate Division, Third Department, affirmed the lower court's finding of liability and serious injury and found Defense Counsel's arguments "meritless."

25.     In January 2007, Plaintiff's Counsel served the expert reports of a life planner and an economist projecting plaintiff's economic losses in the range of $2.4 to $4.5 Million and increased Horton's demand for settlement to $3.5 Million.

26.     In spite of that fact that liability and serious injury had been conclusively established, that interest had been accruing at a rate of 9% for two years, that the defense medical expert had confirmed that plaintiff's multiple surgeries were caused by the accident and that her disability was permanent, and that the trial court judge expressed his unbiased view that the damages were far in excess of the NY Central policy limits at a pretrial conference held on June 1, 2007, NY Central refuse to increase its $75,000 offer.

27.     On June 4, 2007, Horton's Counsel sent a letter to NY Central asserting that it has been negotiating in bad faith.

28.     Warden's insurance defense counsel furnished the June 4, 2007 "bad faith" letter to NY Central and Quincy.  Quincy advised that it could not contribute to the settlement, pursuant to the terms of its policy, until NY Central's $500,000 primary policy limit was tendered.

29.     On July 20, 2007, Warden's personal counsel wrote to NY Central, requesting that NY Central tender the $500,000 limits and stating that anything less would be in bad faith.

Warden's personal counsel further stated that the plaintiff would settle for approximately $1 Million *in toto* and encouraged NY Central to tender its policy limits so that Horton's counsel could negotiate with Quincy.

30.     On December 17, 2007, Horton underwent a fourth surgical procedure that consisted of a fusion at the L5-S1 level.

31.     On November 10, 2008, Horton underwent a fifth surgical procedure to repair a large ventral incisional hernia of the lower abdomen.

32.     In July 2009, Horton's counsel served updated expert reports concluding that plaintiff has $255,700 in past lost wages, $416,350 in future lost earnings, and $2.5 to 4.6 Million in life care expenses.

33.     In spite of these events, NY Central made no attempt to settle the case and advised that it would not increase its settlement offer of $75,000.

34.     By letter dated September 11, 2009, counsel for Quincy wrote to NY Central asserting that NY Central has failed to exercise good faith in negotiating the claim and demanded that it make every attempt to settle the matter within its policy limits.

35.     On September 28, 2009, just three weeks before trial, NY Central offered $497,558.07, which represented the $500,000 primary policy limit less a prior payment for property damages.

36.     After NY Central tendered its policy limits, Warden's insurance defense counsel sent a letter to Quincy urging it to settle the case based on facts that NY Central had been ignoring for years:

- Horton had not worked since the accident as an LPN, resulting in $255,000 of past lost wages;

- Warden's expert economist concluded that Horton's future wage loss is at least $375,000;

- Horton's experts have concluded that her future medical is at least $2-$4 Million; and

- The interest accumulated over 4 ½ years since the entry of the judgment on liability will be substantial.

37.    On November 5, 2009, a stipulated judgment was entered against Warden in the amount of $1,069,726.20, plus interest at 9% from May 20, 2005.

38.    Counsel advised the Court of the judgment on the record during which time it was made clear that Quincy and NY Central reserved the right to resolve remaining disputes with respect to apportionment and other issues at a later date.

39.    Thereafter, Quincy paid its portion of the judgment in the amount of $572,168.13, plus $427,831.87 in accrued interest.

40.    Plaintiff's counsel entered a Satisfaction of Judgment in the Schuyler County Clerk's Office in the amount of $1,069,726.20 on December 2, 2009.

## FIRST CAUSE OF ACTION FOR BREACH OF DUTY OF GOOD FAITH AND/OR EQUITABLE SUBROGATION

41.    Quincy repeats and re-alleges paragraphs 1 – 40 as if fully set forth herein.

42.    NY Central, as the primary insurance carrier, had exclusive control over the settlement negotiations with Horton concerning her claims related to the Accident.

43.    As the primary insurer, NY Central owed Quincy, the excess insurer, a duty to act in good faith in defending and timely settling the underlying action against its insured.

44.    NY Central knew or should have known that the value of Horton's claim against Warden was in excess of the NY Central policy limits.

7

45.     NY Central knew or should have known that interest was continuing to accrue at rate of 9% per annum from the entry of summary judgment on liability.

46.     NY Central failed to engage in timely settlement negotiations with Horton in good faith and, as a result, Quincy lost the opportunity to resolve the case for an amount less than its policy limits.

47.     NY Central retained the use of its $500,000 policy limits while the case proceeded through the various adjudicatory levels.

48.     NY Central's actions were in gross disregard of Quincy's interests in settling the underlying litigation and evidenced a pattern of conscious and knowing indifference to the probability that Quincy would be held accountable for a judgment in excess of the primary limits if a timely settlement offer within NY Central's policy limits was not accepted.

49.     As result of NY Central's delay in tendering the policy limits, Quincy has been damaged in amount of $1,000,000, plus interests and costs.

50.     Quincy is entitled to judgment in the amount of $1,000,000, plus interests and costs.

## SECOND CAUSE OF ACTION FOR INDEMNIFICATION FOR INTEREST PAID ON THE JUDGMENT

51.     Quincy repeats and re-alleges paragraphs 1 – 50 as if fully set forth herein.

52.     As a result of the entry of the judgment on liability in 2005, interest in the amount of $427,831.87 was added to the $1,069,726.20 judgment entered on November 5, 2009.

53.     Quincy paid its portion of the judgment in the amount of $572,168.13, plus the entire amount of the $427,831.87 in accrued interest.

54.     Pursuant to the NY Central Policy, NY Central was obligated to pay all interest which accrued after any judgment is entered in addition to its policy limits, including the $427,831.87 of interest.

55.     NY Central's failure to pay the interest in the amount of $427,831.87 was in breach of the terms and conditions of its policy.

56.     Quincy has duly demanded, in accordance with all applicable terms and conditions of the insurance policies, that NY Central reimburse it in the amount of $427,831.87, plus interest.

57.     Despite due demand, NY Central has failed and/or refused to indemnify and reimburse Quincy.

58.     As a result of the foregoing, Quincy is entitled to be indemnified and reimbursed in the amount of $427,831.87, plus interest and costs.

### THIRD CAUSE OF ACTION FOR DECEPTIVE BUSINESS PRACTICES

59.     Quincy repeats and re-alleges paragraphs 1 – 58 as if fully set forth herein.

60.     Upon information and belief, NY Central's actions concerning its settlement and claims handling practices were a consumer-oriented practice which adversely affected the public at large.

61.     NY Central deliberately and materially deceived and misled its insured and Quincy with regard to its effort to settle the underlying litigation within its policy limits in violation of N.Y. GEN. BUS. LAW § 349.

62.     As a result of this deceptive and misleading practice, Quincy suffered damages in the amount of $1,000,000, plus costs and interest.

## DEMAND FOR JURY TRIAL

63.    Plaintiff demands a trial by jury on all causes of action.


**WHEREFORE**, Quincy demands entry of judgment in their favor as follows:

a.    Awarding Quincy damages in the amount of $1,000,000 on the first and third causes of action and $427,831.87 on the second cause of action;

b.    Awarding Quincy costs, expenses, and disbursements incurred in connection with this action, including attorneys' fees, in the maximum amount permitted by applicable law.

c.    Granting Quincy such other and further relief as the Court deems proper.


Dated: Rochester, New York             WARD GREENBERG HELLER & REIDY LLP
June 27, 2012


By:_____/s/ Scott R. Jennette_____
                  Scott R. Jennette


*Attorneys for Plaintiff*
300 State Street
Rochester, New York  14614
(585) 454-0700
sjennette@wardgreenberg.com