IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────

QUINCY MUTUAL FIRE INSURANCE CO.

                Plaintiff,                    Civil Action No.
                                                3:12-CV-1041 (DEP)

     v.

NEW YORK CENTRAL MUTUAL FIRE
INSURANCE CO.,

                Defendant.

─────────────────────────────────────────

APPEARANCES:                      OF COUNSEL:

FOR PLAINTIFF:

WARD GREENBERG HELLY        SCOTT R. JENNETTE, ESQ.
& REIDY LLP                     WILLIAM R. LEINEN, ESQ.
300 State Street
Rochester, NY 14614

FOR DEFENDANT:

PETRONE & PETRONE, P.C.       JAMES COSGRIFF, III., ESQ.
5500 Main Street
Suite 342
Williamsville, NY 14221

## DECISION AND ORDER

This is a bad faith insurance coverage action brought by plaintiff Quincy Mutual Fire Insurance Co. ("Quincy Mutual"), the issuer of an excess liability policy, against defendant New York Central Mutual Fire Insurance Co. ("New York Central"), which in this instance serves in the role of the primary insurer.  Plaintiff's claims present a minor variation on a common theme.  In the typical bad faith case involving both primary and umbrella coverage, the excess carrier argues that the primary carrier could have settled the underlying dispute within the limits of its policy, thereby avoiding any exposure to the excess carrier, and that the failure to do so constituted bad faith and opened the insured to liability above the primary policy's limits.  In this case, Quincy Mutual asserts that New York Central should have tendered the full extent of its primary coverage in the underlying personal injury action against the parties' insured, and that, had it done so, either the case would have settled for that amount or, at a minimum, Quincy Mutual could have supplemented that tender with payment of far less than the full extent of its excess coverage, which it ultimately paid due to New York Central's alleged bad faith negotiating posture.

This action was recently tried to the court.[1]  For the reasons set forth below, I find that New York Central acted in gross disregard for the interests of Quincy Mutual, the excess carrier, in its dealings with respect to the underlying action, and in particular in its negotiation strategy, and therefore find in plaintiff's favor.  The following discussion embodies my findings of fact and conclusions of law, as required under Rule 52(a)(1) of the Federal Rules of Civil Procedure.

I.      BACKGROUND

New York Central is an insurance corporation organized and existing under the laws of the State of New York and headquartered in Edmeston, New York.  New York Central is licensed to conduct business in New York, and issues automobile and homeowner's insurance policies, as well as a small number of commercial insurance policies.

New York Central issued State of New York Personal Automobile Liability Insurance Policy No. 7104220, providing primary liability insurance coverage in the amount of $500,000 to Randolph Warden covering the period from August 11, 2000, to August 11, 2001.  That policy included a provision stating, "In addition to our limits of liability, we will pay

---

[1]      The matter is before me on consent of the parties, pursuant to 28 U.S.C. § 636(c).

on behalf of an 'insured. . . ' [i]nterest accruing after a judgment is entered in any suit we defend."

Quincy Mutual is a corporation formed under the laws of the Commonwealth of Massachusetts, and is licensed to conduct insurance business in the State of New York.  Its principal place of business is in Quincy, Massachusetts.  Quincy Mutual issued to Warden State of New York Home Owner's Policy No. HP195802, which provided excess liability insurance coverage in the amount of $1,000,000 per occurrence, covering the period of July 29, 2000, through July 29, 2001.  That policy contained the following provisions:

**LIMIT OF LIABILITY**

1. The limit of liability of this endorsement is one million dollars ($1,000,000) for any one **occurrence**. Our liability for damages resulting from one **occurrence** is only for that portion of the damages which exceeds the [primary policy] **limit**.

. . .

**CONDITIONS OF THIS ENDORSEMENT**

. . .

8. Other insurance.  If a **covered person** has other collectible insurance that covers damages this endorsement also covers, this

4

endorsement shall be excess to and will not contribute with such other insurance. This does not include insurance bought to apply in excess of the amount of deductible plus the limit of coverage of this endorsement.

The Quincy policy also contained the following provision:

COVERAGES

. . .

2.   a.   If it is claimed that a **covered person** is legally responsible for damages 1) which are not payable under any underlying insurance due to exhaustion of all underlying insurance, 2) which are covered under this endorsement except for the **retained limit**, we will:

. . .

(3)   pay all our expenses; pay all court costs a **covered person** is charged; pay all interest accruing after a judgment is entered until we pay, tender or deposit in court that part of the judgment this policy covers.

Under that policy, Quincy Mutual's defense and indemnification obligations in a matter covered by Warden's primary policy with New York Central would become operative only upon tender or exhaustion of defendant's policy limits.

5

On November 21, 2000, Warden was involved in a serious motor vehicle accident in the Town of Ulysses caused by his failure to yield the right-of-way at an intersection controlled by a stop sign.  As a result of that accident, Peggy Horton, the driver of the vehicle struck by Warden, sustained serious personal injuries.  Following the accident, Warden was cited for failing to yield the right-of-way at a stop sign, in violation of New York Vehicle and Traffic Law § 1142(a), and ultimately entered a guilty plea to an amended charge of failing to obey a traffic control device, as prohibited under New York Vehicle and Traffic Law § 1110(a).

Timely notice of the accident and potential resulting claim was provided by Warden's insurance agent to both New York Central and Quincy Mutual.  Following that notice, New York Central accepted coverage and assigned the claim to David Monahan, a Senior Casualty Examiner, who worked under the supervision of Diane Wildey, a Casualty Manager and Assistant Vice President.  Monahan handled the Horton claim from inception to conclusion.  Upon Quincy Mutual's receipt of notice of the Horton claim, it also accepted coverage and assigned the matter to James Hardy, a Senior Litigation Examiner.  Hardy monitored the claim through its resolution under the supervision of Ray Congdon, General

Liability and Litigation Manager, and Lisa Grealish, Executive Counsel and Vice President of Claims.

From 2001 up through 2009, New York Central did not have any formal written policies, practices, or procedures in place to guide adjusters like Monahan concerning settlement practices.   As a casualty examiner, Monahan was given blanket authority by New York Central to settle cases and establish reserves in a matter, up to $75,000.[2]  To exceed that amount, Monahan would have to either obtain authority from Wildey or, alternatively, present the matter to the company's Liability Committee, which met weekly.[3]  In November 2001, New York Central and Quincy Mutual set aside reserves in the amounts of $5,000 and $2,500, respectively, concerning the Horton claim.

On October 18, 2001, Horton commenced a personal injury action against Warden in New York State Supreme Court, Schuyler County (hereafter referred to as "the Horton matter" or "the underlying litigation"), arising from the November 21, 2000 motor vehicle accident.  In her

---

[2]    According to Wildey, a "reserve" is the amount of money set aside in connection with a claim, generally reflecting what the carrier believes the settlement value of a matter should be at the particular point in time.

[3]    The proof at trial reflects that Monahan never submitted the Horton matter to the Liability Committee.

complaint, Horton alleged that Warden negligently caused the accident, which resulted in her suffering from serious physical injuries, and sought damages in the amount of $1 million.  Horton was represented in the action by Christopher D'Amato, Esq., of the firm of Cellino & Barnes, P.C. New York Central retained Frank Losurdo, Esq., of the firm of Brown and Michaels, P.C., to represent and defend Warden in the action, and it controlled the defense of the action from its inception until in or about January 2008.  By conceding coverage and assuming control of the defense, New York Central, as the primary insurer, acknowledged its duty to promptly investigate the claim; effectuate a prompt, fair and equitable settlement; settle the claim within policy limits; continually assess and reassess the value of the case during its pendency; keep Quincy Mutual, as the excess carrier, advised concerning settlement developments; and place Quincy Mutual's interests on equal footing with those of New York Central.

On December 4, 2001, Hardy, Quincy Mutual's Litigation Supervisor handling the claim, wrote to Monahan at New York Central informing him of the excess coverage and requesting confirmation of the New York Central $500,000 primary coverage.  Monahan responded on December 27, 2001, providing a copy of the declaration page issued by New York

Central to Warden, and adding "[a]t this time, we feel we do have adequate coverage for damages [Horton] has sustained."

At the time of her accident, Horton was a thirty-seven year old married mother of three children and had been employed as a licensed practical nurse earning $12.36 per hour.  Horton did not work either as a nurse or in any other employment position, following the accident, and ultimately was found qualified to receive Social Security disability benefits.

As a direct result of injuries suffered in the motor vehicle accident, Horton has undergone six separate surgeries.  She initially underwent spinal fusion/cage surgery at the L4-L5 level on October 11, 2001.  A second surgical procedure was performed on August 29, 2002, involving the insertion of a percutaneous pedicle screw instrumentation at the L4-L5 level, due to lumbar instability at the fusion site caused by a non-union of the L4 and L5 vertebral bone segments.  Horton underwent a third operation on October 28, 2002, to repair an incarcerated incisional hernia of the left lower abdomen along the scar line associated with the incision from the prior L4-L5 fusion surgery.

A fourth surgical intervention was performed on November 29, 2004, to remove the pedicle screw instrumentation at the L4-L5 level.  That was followed, on December 17, 2007, with disc fusion surgery at the L5-S1

9

level, necessitated by increased stress from the L4-L5 fusion.  Horton underwent a sixth surgical procedure on November 10, 2008, to repair a ventral incisional hernia of the lower abdomen caused by the surgery in 2007.  Horton's six operations have left her with permanent incisional scars.

In addition to her physical injuries, Horton has suffered mentally from the effects of her accident.  A report generated following a psychiatric examination of Horton, conducted at the direction of the New York State Department of Temporary and Disability Assistance, Division of Disability Determinations, concluded that she suffers from major depression and post-traumatic stress disorder ("PTSD") as a result of the accident.  On February 3, 2004, Attorney Losurdo sent a letter to Monahan at New York Central advising that Horton had "sought psychological treatment and the staff psychiatrist has indicated that she has Major Depressive Disorder secondary to the MVA involving our insured."  Horton's mental condition was again addressed in a letter, dated February 12, 2007, from Attorney Losurdo to Monahan, noting that Horton was making a claim of

depression, and stating that he had opted not to retain an expert on the issue "because it is often problematic."[4]

New York Central increased its reserve amount in connection with the matter to $175,000 on March 23, 2003.  Quincy Mutual followed by increasing the amount set aside to satisfy the Horton claim to $5,000 on March 4, 2004.

On December 18, 2003, at the request of Attorney Losurdo, Horton underwent an independent medical examination ("IME") conducted by Dr. Anthony Avellanosa.  In a report following that exam, which was provided to New York Central on or about February 3, 2004, Dr. Avellanosa concluded as follows:

> Subsequently, the performance of a more specific diagnostic test (lumbar discogram and CT scan) on May 15, 2001 have [sic] demonstrated the presence of two fissures at the nine o'clock position on the right L4-5 disc. The discogram in this particular case is considered abnormal or positive indicating the presence of a herniated disc at the L4-5 level. The presence of this radial tear/fissures at L4-5 is indicative of a direct injury to the intervertebral disc subsequent to the motor vehicle accident of November 21, 2000.

---

[4]     In addition to failing to retain an expert to address the psychological claims raised by Horton, New York Central did not conduct a psychological independent medical examination ("IME") to evaluate her claims of PTSD and depression.

In his report, Dr. Avellanosa also made the following findings:

- Horton sustained a radial tear, two fissures and herniation of her L4-5 disc as a direct result of the subject motor vehicle accident;

- Horton's surgical fusion surgeries were medically necessary;

- Horton had not reached maximum medical improvement and required further physical therapy;

- Horton was unable to return to her job as a nurse; and

- Horton's scar formation, surgical trauma, and surgical implantation will cause a significant and permanent injury.

Monahan was aware that Dr. Avellanosa's IME report "was not a good development for the defense."

On November 4, 2004, Attorney Losurdo wrote to Monahan at New York Central, noting that Horton had filed a motion for partial summary judgment in the underlying litigation on the issues of liablity and serious injury.  In that letter, Attorney Losurdo predicted that liability would be assessed against Warden even if the motion was not granted.  He also explained that the accident reconstruction expert retained by New York Central would not give an opinion for the defense at trial.  This was followed by a letter, dated April 24, 2005, from Attorney Losurdo to

12

Monahan, in which he stated, "We will have a difficult time defending against liability at trial based on our insured's statement and testimony regarding the fact that he failed to look before proceeding into the roadway."

On May 18, 2005, the trial court granted Horton's summary judgment motion in the underlying litigation and entered judgment in her favor on the issues of liability and serious injury.[5]  New York Central was notified of that decision by Attorney Losurdo both verbally and by letter dated May 25, 2005, to Monahan.  In that letter Attorney Losurdo expressed his view that "[t]here is not much basis for appealing the serious injury finding since [Horton] relied on our own IME," additionally noting that "the accident reconstruction expert [New York Central] retained . . . was reluctant to do a written report and will not testify at trial based on his investigation." Attorney Losurdo nonetheless addressed the potential benefits of filing an appeal for purposes of enhancing Warden's negotiating position.

_____

[5]      Warden's liability in the Horton matter was never seriously in doubt.  By March 20, 2001, New York Central had formed an assessment that its insured was negligent in failing to yield the right-of-way and causing the subject motor vehicle accident.  By letter dated August 27, 2003, Attorney Losurdo wrote to Monahan predicting that a majority of the fault would be assessed against Warden based upon his failure to look left immediately before entering the intersection, and reiterating the "limited evidence" New York Central had to defeat a motion for summary judgment.  According to his testimony at trial, Monahan agreed with that assessment.

Monahan, on behalf of New York Central, subsequently authorized counsel to appeal the trial court's determination.  At the time, New York Central was aware that, under New York law, interest began to accrue at a rate of nine percent per year immediately upon the entry of summary judgment on the question of liability.  The appeal was ultimately perfected and argued before the New York State Supreme Court Appellate Division, Third Department, on June 9, 2006.

On or about December 14, 2005, Monahan authorized Attorney Losurdo to offer $75,000 in settlement of the Horton matter.  This was the first settlement offer approved by New York Central.  The offer was conveyed to Horton's counsel in anticipation of a mandatory settlement conference scheduled for December 16, 2005, in accordance with the Third Department's practices.  At the time the offer was made, Horton's counsel, Attorney D'Amato, was unaware of the existence of the Quincy Mutual excess policy and had demanded $500,000.  At trial, Attorney D'Amato testified that Horton would have accepted $500,000, if offered in December 2005, to settle the matter.  New York Central's offer of $75,000 was rejected as "ridiculous."

Horton's counsel first learned of the existence of the Quincy Mutual $1,000,000 excess coverage policy in January 2006.  Despite that

disclosure, Attorney D'Amato did not withdraw the $500,000 demand, which was left open during the pendency of Warden's appeal to the Third Department.[6]  According to Attorney D'Amato, had New York Central offered $500,000 in or prior to August 2006, he would have recommended that Horton accept the offer.[7]

The trial court's summary judgment determination was affirmed by the Third Department on August 3, 2006.  In its decision, the appellate court rejected as "meritless" Warden's principal argument that Horton's prior accident, which had occurred in 1999, and preexisting degenerative spine condition raised issues of fact concerning the questions of causation and serious injury.

Attorney Losurdo wrote to New York Central on August 9, 2006, advising of the decision and stating that he did not believe there were any further appeal options regarding the issues addressed in the decision.

_____

[6]    Indeed, Attorney D'Amato left the $500,000 demand open for five months after the Third Department issued its decision, in August 2006, affirming the trial court's entry of summary judgment.

[7]    It appears from the record that, at some unidentified time prior to the conlusion of the Horton matter, New York Central paid $2,441.93 on a property damage claim stemming from the motor vehicle accident, leaving $497,558.07 available under the policy.  I find that Horton would have accepted this remaining amount (rather than $500,000 precisely) at the times in the underlying litigation when the $500,000 demand was open.

After having been advised of the decision, New York Central understood it did not have any remaining, viable arguments or defenses on the issues of liability, causation, and serious injury.  Accordingly, the only remaining question for trial in the underlying litigation concerned damages.  On September 14, 2006, following notice of Thid Department's decision, Quincy Mutual increased its reserve in the matter to $12,500.

On January 17, 2007, in anticipation of a pretrial conference scheduled for January 19, 2007, Attorney D'Amato wrote to Supreme Court Justice Elizabeth Garry, announcing that Horton's demand in the case had increased to $3.5 million.  Attorney Losurdo communicated that figure to Monahan at New York Central, and, because the demand exceeded New York Central's policy limits, he also forward the demand to Hardy at Quincy Mutual and to Warden as the insured.  At the pretrial conference, Attorney Losurdo announced that New York Central's offer remained at $75,000.  By letter dated January 23, 2007, Attorney Losurdo advised New York Central that a trial on the issues of damages was scheduled to commence on August 20, 2007.

In January 2007, Horton's trial counsel disclosed expert reports to Attorney Losurdo.  In those reports, which were provided by Attorney Losurdo to New York Central on February 12, 2007, Horton's retained

experts opined that, as a result of the injuries sustained in the motor vehicle accident, she was permanently and totally disabled, and had lost $170,370 in past wages and would realize $1,029,084 in future wage losses.  Horton's expert disclosure also estimated her future life care costs at between $2,391,755 and $4,461,528.  After receiving those reports, as well as being advised that Horton would also be seeking recovery of damages for psychological injuries arising from the accident, New York Central and Attorney Losurdo elected not to retain a lifecare expert to assess Horton's claims and, instead, decided to rely on the medical record review for purposes of cross-examining her experts.[8]

In early 2007, Warden retained Raymond Schlather, Esq., as his personal attorney to monitor the state court action and protect his interests.  Attorney Schlather thereafter provided notice of his retention as Warden's personal counsel to both New York Central and Quincy Mutual.

On May 23, 2007, Attorney Losurdo wrote to Monahan advising that Quincy Mutual did not intend to contribute to a settlement in the Horton matter until New York Central tendered its policy.  Two days later, Attorney

---

[8]     Despite an announced intention to seek recovery of psychological damages at trial, Horton's attorney failed to disclose that intention in either the original or supplemental bills of particulars filed in the state court action.

Losurdo served responsive expert disclosures in connection with the underlying litigation on behalf of Warden. Those disclosures included reports by New York Central's retained IME examiner, Dr. Anthony Avellanosa; Charles Clearly, a vocational rehabilitation expert; Dr. Kenneth V. Pearson, who reviewed Horton's medical records; and Matthew McCabe, who rendered opinions regarding Horton's lost wages and other economic losses. In one of his reports, Dr. Avellanosa opined that Horton "sustained a marked permanent disability caused by the motor vehicle accident of November 1, 2000." He further concluded that, although Horton would be unable to return to her past relevant work as a nurse, she could work in a sedentary position, an opinion echoed by Charles Cleary, Warden's vocational rehabilitation expert. In his report, Warden's economic expert estimated that Horton had a work life expectancy of 54.9 years, 17.9 years of which remain after her accident, with a pre-injury earning capacity of $557,265 as a nurse. After receiving these reports, on May 31, 2007, New York Central increased its reserve in connection with the matter from $175,000 to $375,000, but did not increase its $75,000 offer. In his May 25, 2007 letter to Monahan,

Attorney Losurdo stated, "We need to advise the Quincy Mutual adjuster of our case assessment[.]"[9]

Schuyler County Supreme Court Justice Elizabeth A. Garry scheduled a pre-trial conference in the Horton matter for June 1, 2007. Adjusters for both New York Central and Quincy Mutual were directed to be available by telephone at the time of the conference.  On the day of the pretrial conference, Attorney D'Amato informed the court and Warden's counsel that his client was willing to reduce her settlement demand from $3.5 million to $1.5 million, the combined extent of the primary and excess coverage provided by New York Central and Quincy Mutual.  In response, Attorney Losurdo advised the court that New York Central's offer remained at $75,000.  That exchange prompted Horton's counsel to send a bad faith letter addressed to Attorney Losurdo, with a copy to Quincy Mutual, on June 4, 2007.  In that letter, Attorney D'Amato noted the trial court's belief, as expressed during the pretrial conference, that the verdict potential in the case, with accrued interest, exceeded the combined $1.5 million dollar coverage.  Attorney D'Amato also noted that the defense was disadvantaged in light of the fact that (1) Warden's retained IME physician

---

[9]     As will be seen, New York Central never undertook a case assessment until late September 2009.

had encountered disciplinary problems and was no longer permitted to

perform surgeries as a result of malpractice claims against him; (2) Horton

had applied for and was granted Social Security disability benefits due to

her inability to work; and (3) Horton was ongoing treatment for significant

depression.   Attorney D'Amato reiterated that Horton was willing to accept

a settlement in the amount of the available combined insurance coverage

from New York Central and Quincy Mutual, without subjecting their insured

to exposure for additional, uninsured liability.

On June 11, 2007, Attorney Losurdo wrote to Hardy at New York

Central to report on the pretrial conference held ten days earlier.

Specifically, he noted that,

> the Judge . . . did want me to advise that she
> thought the current offer of $75,000 was low in light
> of the injuries at issue *(she indicated that based on
> the summary judgment decision on neligence and
> serious injury and our own IME findings, that she
> believed that this was a significant case and that
> there was damages potential in excess of the
> primary policy).*[10]

Acting on behalf of New York Central, Monahan responded to Attorney

D'Amato's bad faith letter on June 12, 2007, reiterating the earlier $75,000

---

[10]      Also in that letter, Attorney Losurdo acknowledged Dr. Avellanosa's professional
disciplinary problems, including malpractice lawsuits pending against him.  Attorney
Losurdo wrote, "[U]nfortunately there was significant disciplinary action against [Dr.
Avellanosa] which will adversely effect his testimony."

settlement offer and stating that the carrier was "willing to continue to negotiate a settlement."

A second pretrial conference was held in the state court action on July 13, 2007. At that conference, the court granted Horton's request by her attorney for adjournment of the trial, based upon a recommendation from Horton's treating neurosurgeon that she undergo a further discectomy and fusion surgery at the L5/S1 level, which had become unstable due to the prior fusion at L4-L5.[11] During the conference, New York Central maintained its $75,000 settlement position. At his deposition before trial, Attorney D'Amato testified that he had authority from Horton to accept a $750,000 offer at the time of the July 2007 conference.[12] Horton's position was conveyed by Attorney D'Amato to Attorney Schlather at or about the time of that conference, and Attorney Schlather indicated that he would pass it along to Warden's counsel. At that time Lisa Grealish, with Quincy Mutual, would have authorized a settlement contribution of $250,000 in the event New York Central tendered its $500,000 policy in order to settle the matter.

---

[11]    Monahan acknowledged that the need for additional surgery was not a positive development and could potentially increase the value of the case.

[12]    The transcript of Attorney D'Amato's deposition was submitted into evidence at trial.

In a letter dated July 16, 2007, Attorney Losurdo briefed New York Central concerning the pretrial conference, and stated that "[t]he judge was not happy that there was no increased offer after her urging."  The letter also noted that Attorney Schlather "advised the Court that he believed that New York Central should tender the $500,000 policy so that Horton could negotiate with Quincy Mutual, the excess carrier."

On July 20, 2007, Attorney Schlather sent a letter to Monahan at New York Central, with a copy to Quincy Mutual, expressing his belief that "it is highly likely that a jury verdict will exceed $1,500,000, if the case goes to trial" and urging New York Central to tender its $500,000 policy limits "in order to facilitate settlement of this case at this time."  Schlather further stated, "I am requesting that once New York Central tenders its policy Quincy Mutual negotiate in good faith to settle the case in all respects within the umbrella policy limits."  Attorney Schlather expressed his opinion, based on the pretrial conference held on July 13, 2007, and his conversation with Attorney D'Amato at that conference, that Horton was prepared to settle the case for less than $1,000,000 in total.  Despite those communications, New York Central did not increase its offer above $75,000.  The insurer's response, instead, was to send a letter dated

August 2, 2007 to Attorney Schlather,concluding with the following statement:

> As you are aware, the insured can if they wish, make an offer to [Horton] on their own behalf to settle any possible uninsured excess exposure that they deem imprudent.

By letter dated September 10, 2007, New York Central was advised that Hugh Leonard, Esq., had been retained in the matter on behalf of Quincy Mutual and was asked to provide Attorney Leonard with documents and information concerning the case.   A follow-up letter was sent by Attorney Leonard to Attorney Losurdo on October 2, 2007, requesting additional information concerning the case.  Documents were subsequently provided to Attorney Leonard on October 10, 2007.  Quincy Mutual increased its reserve in the matter on December 27, 2007, to $52,500.

The defense of Warden in the state court action was transitioned in January 2008 from Attorney Losurdo to Keith Miller, Esq., a more experienced trial lawyer.  That development reflected New York Central's intention to focus on preparing for trial rather than settling the case.[13]   On

---

[13]     New York Central did not consult with Quincy Mutual concerning its decision to replace Attorney Losurdo with Attorney Miller and specifically did not ask whether it agreed with that strategy.

23

March 14, 2008, Attorney Miller wrote to Monahan, advising that the action was stayed until the end of 2008, but would have to be restored to the trial docket by February 12, 2009, in order to avoid risking dismissal due to calendar default.

On March 17, 2008, prior to the formal transition of counsel,[14] Attorney Schlather wrote to Attorney Losurdo forwarding a signed consent-to-change-attorney form on behalf of Warden but expressed concern over the apparent change in strategy.  In that letter, Attorney Schlather stated the following:

> New York Central Mutual is persisting in grossly undervaluing this case and unreasonably exposing the personal assets of Mr. Warden to judgment. Further, the reassignment [to Miller] under the circumstances suggests that New York Central Mutual has rejected your recommendation with respect to settlement of the claim, and apparently is gearing up for trial with counsel who may be more amenable to such a strategy.
>
> *    *    *
>
> Finally, for my records, please forward copies of all correspondence by and between you and anyone at New York Central Mutual concerning this case. Please include all evaluations of the underlying

---

[14]      Attorney Miller did not file his official consent-to-change-attorney form with the state court until April 2008.

claim and all recommendations with respect to
settlement, whether by you are by anyone else.

New York Central did not respond to Schlather's letter and specifically did

not provide Warden's private counsel with the requested case evaluations.

By letter dated April 22, 2009, Attorney Miller notified New York

Central that the damages trial in the underlying litigation was scheduled to

begin on October 19, 2009.  In anticipation of that trial, on May 11, 2009,

Robert S. Nolan, M.D., performed a supplemental IME of Horton on behalf

of the defense, concluding that she has "a failed back syndrome," and "will

require pain management."  The IME report also reflected that Horton "has

no good days, with no pain free intervals, with significant exacerbations in

the level of her pain."  In his report, Dr. Nolan did not opine that Horton

could return to work.

In July 2009, Attorney Miller forwarded to New York Central updated

expert disclosures received from Horton's counsel, expressing opinions

concerning anticipated future life care costs and earnings losses.  In an

updated report, Horton's lost wages were estimated at $255,700 in past

earnings and $932,221 for future earnings.  Her estimated life care costs,

according to the experts, were anticipated to range from $2.5 million to

$4.6 million.

25

Between December 2005 and September 2009, Monahan did nothing to obtain authority to settle the case above $75,000.   By letter dated September 11, 2009, Attorney Leonard, Quincy Mutual's monitoring counsel, advised Monahan that, in light of its failure to increase its offer above $75,000, Horton had withdrawn her demand to settle within the policy limits.  In the letter, Attorney Leonard exhorted New York Central to offer at least the lowest disclosed economic value of the case, $304,000, in order "to encourage [Horton] to engage in meaningful settlement discussions prior to the trial."

On September 28, 2009, Attorney Leonard wrote to Attorney Miller advising that he had been contacted by Attorney Stephen Barnes, Esq., of Cellino & Barnes, three days earlier regarding the Horton matter, and stating that, while New York Central had increased its settlement to $200,000, Horton had not reduced her demand.[15]  Attorney Miller subsequently provided an oral case evaluation concerning the underlying

---

[15]     The record is equivocal as to whether there was an intervening step-increase in the $75,000 offer before the New York Central Mutual policy was tendered.  According to Monahan, there was no intermediary offer.  Attorney D'Amato, who represented Horton in the state court action, however, testified that sometime within weeks of the anticipated trial date the offer on behalf of Warden was increased from $75,000 to $200,000.  Attorney Leonard's letter, dated September 28, 2009, appears to substantiate the fact that there was an offer of $200,000 made at some point within the September 2009 timeframe.

litigation to New York Central in late September 2009.  According to Monahan, this was the first verdict potential valuation performed by or on behalf of New York Central concerning the matter.[16]  Finally, on September 28, 2009, New York Central capitulated, offering to settle the state court action for $497,558.07, the limit of its policy coverage after deduction for prior payments rendered to cover property damage incurred in the accident.  Once that decision was announced, Quincy Mutual believed it then had authority, as Warden's umbrella policy carrier, to negotiate the excess portion of the Horton claim.

Immediately upon learning of the tender of the New York Central policy, Attorney Leonard wrote to Attorney Miller on September 29, 2009, requesting information for Quincy Mutual's settlement consideration and stating the following:

> Quincy Mutual may be willing to extend authority for settlement but first needs the above information for consideration.  In the meantime it is expected that you will continue to vigorously defend your client and prepare for trial.

---

[16]    Attorney Miller provided New York Central with a written verdict potential analysis on October 9, 2009, after New York Central announced its intention to tender the full policy.  In that report, Attorney Miller wrote that, "[e]ven if everything goes my way I do not feel that there is any chance that I would be able to bring this case in for less than New York Central's $500,000 policy.  Accordingly, I believe that New York Central's tender of the remaining balance of $497,558.07 was your only viable course of action."

27

After having been informed of New York Central's change of position, Attorney Schlather wrote to Attorney Leonard on September 30, 2009, demanding that Quincy Mutual also tender its policy limits in the Horton litigation.  That was followed by a letter written on October 9, 2009, eleven days after New York Central's tender, from Attorney Miller to Quincy Mutual regarding the scheduled damages trial, providing his analysis of the litigation, and stating, "It would seem prudent if Quincy actively engaged in settlement negotiations immediately."  In that letter, Attorney Miller urged Quincy Mutual to tender its policy limits of $1 million. Shortly thereafter, Quincy Mutual offered $250,000 to settle the Horton matter.

On October 14, 2009, Attorney Schlather wrote to Attorney Leonard stating, "I have reason to believe this case can be settled for the policy limits *i.e.,* a total of $1.5 million," and adding "I respectfully insist that your carrier proffer its full policy to settle the claim."  Horton's counsel followed with a letter to Attorney Miller, sent on October 16, 2009, to place Warden, New York Central, and Quincy Mutual on notice of his contention that those parties had engaged in bad faith negotiations in connection with the matter.  On October 17, 2009, Attorney Miller wrote a formal letter to

Quincy Mutual accusing it of bad faith in connection with its settlement negotiations in the state court action.  Attorney Schlather followed, on October 19, 2009, with a bad faith letter to Quincy Mutual, criticizing its negotiation posture.  Three days later, Quincy Mutual increased its reserve in the matter to its policy limit of $1 million.

The Horton matter was ultimately settled, and a stipulated judgment was entered in state court on November 6, 2009, providing for payment to Horton in the amount of $1,069,726.20, with interest, calculated from May 20, 2005, in the amount of $427,831.87.  The entry of a stipulated judgment, as a vehicle for effectuating the settlement, was entered at the request of Quincy Mutual in an effort to preserve its right to pursue a claim against New York Central for payment of prejudgment interest above the $500,000 policy limit pursuant to the Supplemental Payment Provision of its policy.  A check was subsequently issued by New York Central to Horton on November 12, 2009, in the amount $497,558.07, to satisfy its portion of the stipulated judgment.  Of that amount, New York Central paid only $132,479.  The remaining balance of the Warden's settlement contribution was funded by General Reinsurance Company, New York

Central's reinsurer.[17]  Quincy Mutual followed on November 20, 2009, paying $572,168.13 toward the stipulated judgment, plus an additional amount of  $427,831.87 in accrued interest, for a total of $1 million.  A satisfaction of judgment was subsequently entered in the Horton matter on December 2, 2009.

During the final settlement negotiations, a dispute arose between Quincy  Mutual and New York Central concerning whether New York Central was obligated, pursuant to its insurance policy, to pay the interest that had accrued since the entry of summary judgment on May 20, 2005. The question of interest became a stumbling block in the final settlement negotiations.  On June 24, 2010, Quincy Mutual, through counsel, demanded that New York Central reimburse Quincy Mutual the full amount of the interest paid on the Horton judgment.  That demand was rejected by New York Central on July 19, 2010.

---

[17]     As a resinsurer, General Reinsurance played no role in the negotiation and settlement of the Horton claim.

II.   PROCEDURAL HISTORY

Plaintiff Quincy Mutual commenced this action on June 27, 2012.

Following the completion of discovery, the matter was tried to the court,

beginning on February 4, 2014.  The parties have since submitted

proposed findings of fact and conclusions of law, and the matter is now

ripe for determination.

III.   DISCUSSION

A.   Legal Principles Governing Bad Faith Claims Under New York
State Law[18]

In New York, an insurance carrier owes a duty of good faith to its

insured.  *See New England Ins. Co. v. Healthcare Underwriters Mut. Ins.*

*Co.*, 295 F.3d 232, 241 (2d Cir. 2002) ("Insurers owe a duty to their

insureds under New York law to act in good faith when deciding whether to

settle a claim and may be held liable for breach of that duty." (quotation

marks, alterations omitted)); *Pavia v. State Farm Mut. Auto Ins. Co.*, 82

N.Y.2d 445, 452 (1993) ("The notion that an insurer may be held liable for

the breach of its duty of 'good faith' in defending and settling claims over

which it exercises exclusive control on behalf of its insured is an enduring

---

[18]   The parties are in agreement that plaintiff's claims are governed by New York
law.

31

principle, well settled in this State's jurisprudence." (citation omitted)).  This

obligation, which is implied under the insured's policy, is in recognition of

the reality that, when an insurer assumes the defense of a case, it

positions itself to control strategy and act on behalf of the insured.  *Pinto v.*

*Allstate Ins.*, 221 F.3d 394, 398 (2d Cir. 2000); *accord, Fed. Ins. Co. v.*

*Liberty Mut. Ins. Co.*, 158 F. Supp. 2d 290, 294 (S.D.N.Y. 2001); *Pavia*, 82

N.Y.2d at 452; *Fed. Ins. Co. v. N. Am. Specialty Ins. Co.*, 83 A.D.3d 401,

402 (1st Dep't 2011).  When a carrier is faced with making decisions

regarding settlement, an inherent conflict arises pitting the insured's desire

to avoid liability beyond policy limits against the carrier's interest in

minimizing the amount required to settle the case.  *Pavia*, 82 N.Y.2d at

452.  New York courts have recognized "[t]he availability of a bad faith

cause of action encourages settlements that are in the insured's best

interests, and also discourages insurance companies from refusing to

settle as a matter of policy."  *Pinto*, 221 F.3d at 399 (citation omitted).

An insurer's duty of good faith is not limited to the insured, extending

to excess carriers where the primary insurer is defending in a case in

which both insurance companies have provided coverage.  *New England*

*Ins.* Co., 295 F.3d at 241; *Fed. Ins. Co.*, 158 F. Supp. 2d at 294; *Fed. Ins.*

*Co.*,  83 A.D.2d at 402.  In such circumstances, "[a] primary insurer

discharges its duty of good faith by giving as much consideration to the excess carrier's interests as it does to its own." *New England Ins. Co.*, 295 F.3d at 241; *Fed. Ins. Co.,* 158 F. Supp. 2d at 294.

New York courts have acknowledged the existence of a strong presumption against bad faith on the part of a primary insurer. *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 624 (2d Cir. 2001). To overcome this presumption and establish bad faith, an excess carrier must show that the primary carrier acted in gross disregard to the interests of the excess carrier. *New England Ins. Co.*, 295 F.3d at 241; *Fed. Ins. Co.*, 83 A.D.2d at 402. "This requires a showing that the insurer's conduct involved a 'deliberate or reckless failure to place on equal footing the interests of its insured [or excess carrier] with its own interests when considering a settlement offer.'" *Pinto*, 221 F.3d at 399 (quoting *Pavia*, 82 N.Y.2d at 453). Although this does not require a plaintiff to prove the defendant acted with "sinister motives," a plaintiff does need to establish more than mere negligence or mistake in judgment. *Pavia*, 82 N.Y.2d at 453.

When considering whether a primary insurer acted in good faith with respect to excess carriers, the court must take into consideration "all the facts and circumstances relating to the insurer's investigation of the claim."

*Pinto*, 221 F.3d at 399.   The question of whether bad faith has been

established is informed by "a number of factors," including

> plaintiff's likelihood of success on the issue of
> liability, the potential damages award, the financial
> burden on each party if the insurer refuses to settle,
> whether the claim was properly investigated, the
> information available to the insurer when the
> demand for settlement was made, and. . .  any other
> relevant proof tending to establish or negate the
> insurer's good faith in refusing to settle.

*Id.* (citing *Pavia*, 82 N.Y.2d at 454-55).  In particular, "a trial court should

look to see if there is a high probability that the insured [or excess carrier]

would be subject to personal liability because of the insurer's actions, and

whether an excess verdict reasonably could have been predicted."  *Pinto*,

221 F.3d at 399 (citing *Brockstein v. Nationwide Mut. Ins. Co.*, 417 F.2d

703, 707 (2d Cir. 1969)).   "Under New York law, a primary insurer's

unrealistic settlement posture that exposes an excess carrier to risk is

potentially significant evidence of bad faith."  *Scottsdale Ins. Co. v. Indian*

*Harbor Ins. Co.*, --- F. Supp. ----, No. 12-CV-2632, 2014 WL 185597, at

*16 (S.D.N.Y. Jan. 16, 2014) (*citing State v. Merchs. Ins. Co. of N.H.*, 109

A.D. 2d 935, 936 (3d Dep't 1985)).

     To prevail in this action, in addition to demonstrating a breach of the

duty of good faith owed by New York Central, Quincy Mutual must also

establish a causal link to the damages claimed.  *New England Ins.,* 295

F.3d at 241.  Said differently, to recover in this action, Quincy must prove

that, had New York Central acted in good faith throughout the negotiation

process, a settlement would have been realized, and that settlement would

have required Quincy Mutual to pay less than the full extent of its excess

policy.  *Id.*; *see also Pavia*, 82 N.Y.2d at 454 ("[T]he plaintiff in a bad-faith

action must show that the insured lost an actual opportunity to settle the . .

. claim at a time when all serious doubts about the insured's liability were

removed.").

## B.   Application

In this case the potential opportunity to settle the underlying matter

arose at two distinct points in time.  At trial, Quincy Mutual adduced

evidence that, had New York Central tendered its policy in December

2005, Horton's attorney, at that point unaware of the existence of excess

coverage, would have recommended that she accept the offer.[19]  Indeed,

---

[19]    Despite New York Central's insistence otherwise, the record does not
unequivocally demonstrate that Attorney D'Amato's knowledge of the excess policy
would necessarily have altered his demand in December 2005.  To ensure the record
is clear on this point, Attorney D'Amato testified at his deposition as follows:

> Q.    Okay. When you made that demand of $500,000, did
> you believe at that point that that's all the case was worth?

MR. JENNETTE:      Objection.

THE WITNESS:      As far as settlement value goes, because that's all that was disclosed to me, as far as coverage goes.

BY MR. COSGRIFF:

Q.      If you were aware of the fact then, in fall of 2005, that in addition to the primary policy of $500,000, if you were made aware of the fact that there was an umbrella policy in the amount of $1 million, your demand at that point in time would have been in excess of $500,000, fair to say?

A.      Potentially. I don't think I did that though. Because, again, he – I got summary judgment. I think he disclosed the million sometime in December of '05 into January of '06. I can't remember exactly when. Somewhere in that time frame.
        But, again – and then the appeal was still pending, so I – I didn't do anything beyond the $500,000 demand, 'cause I'm sure you know with appeals maybe I lose.

Q.      Well, my question is, at the time you made that $500,000 demand –

A.      Yes.

Q.      -- had you known about the umbrella policy, would your demand have been in excess of the $500,000?

MR. JENNETTE:      Objection.

THE WITNESS:      An actual demand?

MR. COSGRIFF:      Yes.

THE WITNESS:      Yeah, a demand's a demand.

MR. COSGRIFF:      Okay.

36

Attorney D'Amato testified that he had his client's full authority to settle the

---

> THE WITNESS:      You mean would it have been, yes. I had summary judgment, just because he was – yes, it would have been.
>
> . . .
>
> Q.      What did you believe the value of your case to be in fall of 2005 –
>
> MR. JENNETTE:      Ob – objection.
>
> BY MR. COSGRIFF:
>
> Q.      -- knowing all the factors that we just talked about?
>
> MR. JENNETTE:      Objection to the term value.
>
> THE WITNESS:      Yeah, settlement value would have been 500,000, at or near that, with an open appeal.
>
> BY MR. COSGRIFF:
>
> Q.      In fall of 2005, regardless of the pending appeal, if you knew about the $1 million excess policy, your demand would have been more than $500,000, fair?
>
> MR. JENNETTE:      Objection.
>
> THE WITNESS:      My actual demand?
>
> MR. COSGRIFF:      Yes.
>
> THE WITNESS:      Yeah.

In light of this equivocal testimony, and taking into account that Attorney D'Amato credibly testified that his $500,000 demand remained in effect, even after he learned of the excess policy, until January 2007, I find that his knowledge of the existence of the excess policy in December 2005 is not dispositive regarding whether Horton would have settled for $500,000 at that time.  In any event, I remain mindful that in December 2005, when Attorney D'Amato made his demand of $500,000, the reason he did not know of the excess policy was solely the consequence of New York Central's decision not to disclose that coverage.

case for $500,000 in December 2005.  This testimony is sufficient to satisfy Quincy Mutual's burden of establishing, by a preponderance of the evidence, that there existed "an actual opportunity to settle" the claim at that time.  *See New England Ins. Co.*, 295 F.3d at 244 (relying on the trial testimony of counsel for the underlying plaintiffs in concluding that the malpractice lawsuit would have settled with the underlying defendant for $500,000 nearly a year-and-a-half prior to when the jury rendered its $2.4 million verdict against that defendant).  Thus, the next inquiry is whether Quincy Mutual has set forth sufficient evidence that, in December 2005, "all serious doubts about the insured's liability were removed."  *Id.* at 241.

On November 4, 2004, while Horton's motion for partial summary judgment was pending in state court, Frank Losurdo, New York Central's attorney, wrote a letter to David Monahan, New York Central's Senior Casualty Examiner handling the case, suggesting that he "expect[ed] . . . the liability would be assessed against [Warden] at trial."  He also stated in the letter that he intended to oppose the summary judgment motion without the use of a report from an accident reconstructionist because New York Central's reconstruction expert would "not give an opinion."  Finally, Attorney Losurdo advised that, "[e]ven if [New York Central] survive[s] the summary judgment motion, [it] will be in a very difficult

position at trial because it is unlikely that the jury would find contributory negligence under these [circumstances]."  On May 18, 2005, the trial court granted partial summary judgment regarding liability and serious injury to Horton.  Although Attorney Losurdo filed an appeal of that decision on behalf of Warden to the New York State Supreme Court Appellate Division, Third Department, he described the appeal as having "little chance of succeeding."  In a letter to Monahan dated May 25, 2005, Attorney Losurdo advised that New York Central "would have a difficult time at trial disputing liability based on our insured's statements (never saw [Horton]; never looked left a second time) and his guilty plea on the traffic ticket."  Nevertheless, Attorney Losurdo recommended an appeal as a means of leveraging settlement from Horton.  At trial before this court, Monahan testified that he authorized the appeal to the Appellate Division despite the fact that it did not have "much of a chance of succeeding."

Although Warden's appeal was pending in December 2005, I find that the foregoing evidence supports a conclusion that, at the time Horton's attorney made his demand of $500,000, there was no "serious doubt[]" regarding Warden's liability.  Based on the record evidence, it appears that both Attorney Losurdo and Monahan also concluded that there was little hope of Warden escaping liability.  For this reason, and

because I find Attorney D'Amato's testimony credible regarding his authority from Horton to accept an offer in the amount of $500,000 in December 2005, I conclude that New York Central "lost an actual opportunity to settle the . . . claim at a time when all serious doubts about [Warden]'s liability were removed."  *New England Ins. Co.*, 295 F.3d at 241.

In addition, by December 2005, New York Central should have reasonably anticipated that Horton's damages would exceed the $500,000 limit of the New York Central policy and trigger Quincy Mutual's umbrella policy.  Although New York Central did not receive Horton's expert reports estimating damages until February 2006, it knew of the following factual developments in the case:

- Horton's complaint in the underlying litigation demanded $1,000,000 in damages.

- At the time of the accident, Horton was a relatively young mother who had a history of regular employment as a nurse.

- Horton underwent fusion surgery on her spine in October 2001.

- Horton underwent a second surgery on her spine in August 2002, to insert a percutaneous pedicle screw because the fusion operation was not successful.

- In October 2002, Horton underwent a third operation for a hernia, which developed as a direct result of earlier surgeries.

- In or about March 2003, Attorney Losurdo informed Monahan that (1) Horton had not returned to work following the accident, (2) Horton obtained little relief from the two spinal operations, and (3) the underlying litigation presented a potentially large wage-loss claim.

- In or about September 2003, Attorney Losurdo updated Monahan regarding Horton's medical records.  He specifically noted, *inter alia*, that one of Horton's doctors opined that she would continue to be on total disability, and she had been diagnosed with major depression and PTSD.

- In December 2003, Dr. Avellanosa, who was retained by New York Central to undertake an IME of Horton, opined in his report, *inter alia*, that (1) all three of Horton's surgeries up to that point were medically necessary, (2) Horton had not yet reached maximum medical improvement and required additional physical therapy, (3) Horton could not return to work at the time at the time of the IME, and (4) Horton sustained a permanent injury as a result of the accident in November 2000.[20]  Monahan acknowledged this report was not a good development for New York Central.

- In or about November 2004, Horton underwent a fourth operation on her spine to remove the pedicle screws inserted in 2002.

- On May 18, 2005, the trial court in the underlying litigation granted Horton's motion for partial summary judgment on liability and serious injury.  In her written decision, Supreme

---

[20]     Notably, by February 2006, and thus within the time period when the $500,000 demand remained in place, Horton was receiving Social Security disability benefits in light of her inability to work.

Court Justice Judith F. O'Shea wrote, "Depsite the fact that Dr. Avellanosa did not specifically declare that [Horton]'s injuries met the serious injury threshold, a complete and thorough reading of his report shows that [Horton] sustained a significant permanent injury[.]"

- In or around May 2005, Monahan was aware that, under New York State law, Horton would receive nine percent interest on any damage award from the date of the trial court's order.  Also in or about this time, Monahan was aware of Horton's "devastating and permanent injuries."

At trial before this court, Monahan testified that he had learned all of the foregoing information by December 2005.  Importantly, New York Central had yet to undertake its own valuation of the case, and the evidence adduced at trial reveals that neither Attorney Losurdo nor Monahan ever sincerely doubted the conclusions of Horton's doctors or Dr. Avellanosa. Accordingly, I find that, by December 2005, New York Central should have known that Horton's damages, which would have included an award for past and future pain and suffering, medical and life care expenses, and lost wages, would exceed the $500,000 primary policy limit, thus triggering Quincy Mutual's excess policy.

In any event, even if the evidence at trial did not conclusively establish that New York Central had an opportunity to settle with Horton for $500,000 in December 2005, the proof supports a finding that, notwithstanding the fact that her demand was $1.5 million, Horton would

have settled with Warden for $750,000 in July 2007.[21]  A month earlier, at

a pretrial conference before the trial court judge, Horton demanded $1.5

million in an effort "[t]o give [New York Central] the opportunity, again, to

try to come to the table and resolve the case[.]"  New York Central did not

increase its $75,000 offer, which was first extended in December 2005.

Another pretrial conference was held on July 13, 2007, at which time New

York Central again extended the same offer.  Immediately following that

conference, Attorneys D'Amato and Schlather continued to talk, at which

time Attorney D'Amato communicated to Attorney Schlather that Horton

would settle the matter for $750,000.  Attorney D'Amato testified that he

had Horton's authority to settle for that amount at the time of the July 2007

conference, and he authorized Attorney Schlather to communicate this

position to New York Central.  In a letter to Monahan dated July 20, 2007,

Attorney Schlather wrote that Horton "is prepared to settle the case for

less than $1,000,000 in tot[al]" if New York Central offered its policy limit of

---

[21]     A lost opportunity to settle can be established even when a settlement demand exceeds limits of primary coverage.  *See Forest Ins. v. Am. Motorists Ins. Co.*, No. 89-CV-4326, 1994 U.S. Dist. LEXIS 3334, at *44 (S.D.N.Y. Mar. 21, 1994) ("Under New York law defendants are not insulated from bad faith liability simply because the Allens never made a demand within the policy limits[.]"); *see also Pinto*, 221 F.3d at 401 ("At least one court construing New York law has noted that plaintiffs' 'willingness to settle for the policy limits is one way, but not the only way, to show that an actual opportunity to settle existed.'" (quoting *Hartford Ins. Co. v. Methodist Hosp.*, 785 F. Supp. 38, 40 (E.D.N.Y. 1992)).

$500,000.  Had tender of the New York Central policy occurred by August 2007, Lisa Grealish, Executive Counsel for Quincy Mutual, testified that Quincy Mutual would have met that figure by offering $250,000.

Moreover, by summer 2007, New York Central was aware that Horton's damages exceeded the combined policy coverage by New York Central and Quincy Mutual.  In February 2007, New York Central had received Horton's expert reports, which concluded that, as a result of the injuries sustained in the motor vehicle accident, she was permanently and totally disabled and would incur the following wage loss and medical and life care expenses:

- $170,373 in past wage loss

- $1,029,084 in future wage loss

- Between $2,391,755 and $4,461,528 in life care costs.[22]

Between February 2007 and September 2009, Horton continued to receive medical treatment for her injuries and update New York Central with her expert disclosures regarding damages.  Notably, at the pretrial conference in June 2007, the trial court in the underlying action severely criticized New

---

[22]     Inexplicably, New York Central did not retain a life care expert to assess Horton's claims of life care expenses, nor did it undertake a valuation of the case, despite being urged to by Warden's personal attorney, until late September 2009.

York Central's settlement position in light of Horton's injuries, highlighting that liability had been firmly established and interest was accruing.  The judge's admonishment was passed along to James Hardy, Senior Litigation Examiner for New York Central, pursuant to a letter by Attorney Losurdo on June 11, 2007.  Although Monahan testified at trial that, "internally, New York Central recognized this as a significant case," it never increased its initial offer, dating back to December 2005, of $75,000 until late September 2009, just days before it announced its intention to tender the full policy limit.

Based on the foregoing, I find that Quincy Mutual has established, by a preponderance of the evidence, that New York Central lost a second opportunity to settle with Horton, at that point for $750,000 in July 2007.[23] Had New York Central tendered its full $500,000 policy at that time, Quincy Mutual would have been responsible for only $250,000, which is $750,000 less than it actually paid.

New York Central's primary argument in response to Quincy Mutual's bad faith allegations in this case is that Quincy Mutual caused or contributed to the failure to achieve settlement prior to the fall of 2009.  It

---

[23]    As was previously discussed above, by July 2007, questions of serious injury and liability had already been established, and only the issue of damages remained for trial.

suggests that Quincy Mutual could and should have entered into negotiations with Horton's counsel prior to the time New York Central tendered its policy, and that doing so would have reduced its liability. Indeed, New York Central's proposed findings are heavily focused upon the conduct of Quincy Mutual and its assigned adjuster, James Hardy, prior to the tender of New York Central's policy.  Although Quincy Mutual's conduct as an excess carrier may have some relevance in a bad-faith action, *Scottsdale Ins. Co.*, 2014 WL 185597, at *19, contrary to New York Central's insistence otherwise, the law places no legal obligation on an excess carrier in Quincy Mutual's position to negotiate a claim unless and until primary coverage is exhausted.   *See Ali v. Fed. Ins. Co.*, 719 F.3d 83, 91 (2d Cir. 2013) ("Coverage under an excess policy thus is triggered when the liability limits of the underlying primary insurance policy have been exhausted . . . . [T]he very nature of excess insurance coverage is such that a predetermined amount of underlying primary coverage must be paid before the excess coverage is activated." (quotation marks and citations omitted)).   Quincy Mutual persuasively argues that, in essence, to find otherwise would unfairly place an excess carrier in the position of a primary carrier.  "New York law[, however,] does not impose on an excess insurer the duty to supervise the primary insurer's handling of settlement

46

negotiations.  Rather, where a primary insurer takes responsibility for defending a case, that insurer has a duty to handle the case in good faith[.]"  *Scottsdale Ins. Co.*, 2014 WL 185597, at *19; *see also Liberty Surplus Ins. Corp. v. Segal Co.*, 420 F.3d 65, 69 (2d Cir. 2005) ("[W]hile excess carriers have discretion to protect their interests by participating in a defense, there is no obligation to [do] so." (quotation marks omitted)).

New York Central has also failed demonstrate how such negotiations could have resolved the matter.  Surely Quincy Mutual could not have reduced its excess coverage exposure below $1 million through negotiations without the consent of its insured, consent that undoubtedly would have been withheld until New York Central tendered its policy and the insured could be guaranteed he would not face excess liability.  Nor has New York Central proffered any evidence suggesting that, once Quincy Mutual was able to negotiate a tentative settlement conditioned upon New York Central's tender, New York Central would then have tendered its entire policy.  I therefore reject the argument that the damages now claimed by Quincy Mutual were caused through its own conduct or inaction.  Without question, by negotiating directly with Horton's counsel in an effort to limit its exposure, Quincy Mutual would have

opened itself to a claim by Warden that it was acting in bad faith by placing its interests ahead of his as the insured.

The appearance of bad faith is even more pronounced in this case due to the fact that, after receiving reimbursement from General Reassurance Company, New York Central paid only $132,479 on behalf of its insured in connection with the Horton claim.  In other words, while it exposed Quincy Mutual to liability for up to $1 million, and its insured to potential excess liability above $1.5 million, New York Central risked only payment of an additional amount of $57,479 above its $75,000 offer by adhering to that untenable position.  And, significantly, during the period the case languished, New York Central had the use of, and was therefore able to earn interest on, the full $132,479.  These facts epitomize bad faith negotiations, suggesting gross disregard for the interests of Quincy Mutual and Warden and placing those of New York Central above them.

C.   Damages

As a result of New York Central's bad faith settlement position, Quincy Mutual was denied the opportunity to settle the Horton litigation for the balance of the New York Central policy limit in December 2005, which was approximately $500,000.  More specifically, had such a settlement been effectuated, New York Central would have paid $497,558.07,

representing the remaining available coverage under its primary policy after payment of a property damage claim, leaving Quincy Mutual to pay nothing.  Plaintiff Quincy Mutual has therefore suffered damage in the amount of $1,000,000, and is entitled to recover judgment for that amount against New York Central based upon the court's finding of bad faith.[24]

### D.   Prejudgment Interest

The next question to be addressed is whether Quincy Mutual is entitled to recover prejudgment interest.  "In a diversity case, state law governs the award of prejudgment interest."[25]  *Schipani v. McLeod*, 541 F.3d 158, 164-65 (2d Cir. 2008) (*citing Baker v. Dorfman*, 239 F.3d 415, 425 (2d Cir. 2000)).  Under New York law, "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right."  *U.S. Naval Inst. v. Charter Commc'ns, Inc.,* 936 F.2d 692, 698 (2d. Cir. 1991) (citing N.Y. C.P.L.R. §§ 5001, 5002).  Section 5001(a) of the New York Civil Practice Law and Rules provides, in relevant part, that "[i]nterest shall be computed from the earliest ascertainable date the

---

[24]     Because this damage award fully compensates Quincy Mutual, meaning that it will be reimbursed for the entire amount it paid to Horton, I have found it unnecessary to address the argument concerning the payment of interest under the supplementary payments provisions found in both of the relevant insurance contracts.

[25]     By contrast, post-judgment interest in this action is governed by 28 U.S.C. § 1961(a).  *Schipani v. McLeod*, 541 F.3d 158, 165 (2d Cir. 2008).

cause of action existed[.]"  CPLR § 5001(b).  In New York, the statutory

rate for prejudgment interest in a breach of contract action is nine percent

per year.  N.Y. C.P.L.R. § 5004; *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d

83, 90 (2d Cir. 1998).  Accordingly, in this case, in addition to recovering

damages, Quincy Mutual is entitled to recover prejudgment interest,

calculated from January 1, 2006, at a rate of nine percent per year, on the

damage amount of $1,000,000 to the date of the entry of judgment.

     E.    <u>Attorney's Fees</u>

Finally, the court is presented with the question of whether Quincy

Mutual is entitled to attorney's fees in this action under state law.  Quincy

Mutual contends that it is entitled to those fees pursuant to New York

General Business Law § 349 ("section 349") because it has proven that

New York Central violated New York Insurance Law § 2061 ("section

2061"), which constitutes a violation of section 349.

Section 349 "provides a private right of action to any person injured

by the deceptive acts or practices committed by a business . . . operating

in New York."  *Riordan v. Nationwide Mut. Fire Ins. Co.* ("*Riordan II*"), 977

F.2d 47, 51-52 (2d Cir. 1992) (citing N.Y. Gen. Bus. L. § 349).  Section

2061 precludes unfair claim settlement practices by insurance companies,

and defines those practices, in pertinent part, as

> [n]ot attempting in good faith to effectuate prompt,
> fair and equitable settlements of claims submitted in
> which liability has become reasonably clear . . .; or .
> . . [c]ompelling policy holders to institute suits to
> recover amounts due under its policies by offering
> substantially less than the amounts ultimately
> recovered in suits brought by them.

*Riordan v. Nationwide Mut. Fire Ins. Co.* ("*Riordan I*"), 756 F. Supp. 732,

738 (S.D.N.Y. 1990), *aff'd in pertinent part, Riordan II*, 977 F.2d 47 (citing

N.Y. Ins. L. § 1601).  As a general matter, a violation of section 2601 may

constitute a violation of section 349.   *See Riordan I*, 756 F. Supp. at 739

("The Court has little difficulty in concluding that a policy and practice

violating New York Insurance Law § 2601 and the rules promulgated

thereunder. . . constitute[] a 'deceptive business practice' sufficient to

satisfy the requirements of Section 349."); *accord, Saterson v. Planet Ins.

Co.*, No. 93-CV-6885, 1994 WL 689084, at *6 (S.D.N.Y. Dec. 8, 1994).

The case law governing a lawsuit under section 349, however, makes

clear (as *Riordan I* suggests) that, to prevail under that provision, a plaintiff

must adduce evidence that the defendant's conduct is injurious to "the

public at large."  *See Riordan I*, 756 F. Supp. at 739 (denying the motion to

dismiss submitted by the insurance-company defendant where the plaintiff

alleged that the defendant promulgated a policy regarding claim

settlement that was "designed to deceive certain categories of

51

policyholders"); *see also Exxonmobil Inter-Am., Inc. v. Advanced Info. Eng'g Servs., Inc.*, 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004) (holding that, to state a claim under section 349, "a plaintiff must allege (1) a deceptive consumer-oriented act or practice which is misleading in a material respect, and (2) injury resulting from such an act" (citing *Andre Strishak & Assocs., P.C. v. Hewlitt Packard Co.*, 300 A.D. 2d 608, 609 (2d Dep't 2002)); *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 320 (1995) ("[P]arties claiming the benefit of . . . section [349] must, at the threshold, charge conduct that is consumer oriented."). In addition, the New York State Court of Appeals has held that "private contract disputes unique to the parties would not fall within the ambit of the statute[.]" *N.Y. Univ.*, 87 N.Y.2d at 320 (alterations omitted).

In this case, I do not find that Quincy Mutual has satisfied its burden of establishing that New York Central violated section 349. The record does not establish, by a preponderance of the evidence, that the conduct of New York Central demonstrated in the underlying litigation stems from a policy or practice that is applicable to the public as a whole or is in any way consumer-oriented. The court acknowledges that Attorney D'Amato testified at his deposition that New York Central has a reputation for being "a difficult carrier," which, in his opinion, meant that "[e]ven in the face of

52

clear-cut injuries, [New York Central] still do[es]n't negotiate."  I am also aware of Attorney Schlather's testimony that, in his experience, he has found New York Central to be "remarkably stingy in negotiations."  Even assuming that New York Central does have a reputation (in some as-yet unidentified community) for taking conservative settlement positions with respect to claims, I do not find that such a reputation, standing alone, would be sufficient to satisfy the requirement under section 349 that a plaintiff prove that the defendant has implemented a practice or policy that generally applies and is injurious to its consumers.  Indeed, the court can conceive of a number of valid reasons for taking a conservative position during settlement negotiations.  Although New York Central's exercise of a version of such conservative negotiation tactics in the underlying litigation amounted to bad faith under all of the facts and circumstances, including clear liability and serious injury, I do not find that Quincy Mutual has established that New York Central's conduct in this case is representative of a larger pattern of behavior that may suggest a company-wide policy that affects all of its insureds.  Accordingly, I find that Quincy Mutual has not proven entitlement to attorney's fees under section 349.[26]

---

[26]     It is worth noting that Quincy Mutual did not cite to any authority holding that an

IV.   <u>CONCLUSIONS OF LAW</u>

(1)   This court possesses subject matter jurisdiction in this case, pursuant to 28 U.S.C. § 1332(a)(1), as an action between citizens of two different states involving an amount in controversy exceeding $75,000, exclusive of interest and costs.

(2)   Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), in light of the fact that defendant New York Central resides within the Northern District of New York.

(3)   New York Central acted in gross disregard of the rights of Quincy Mutual by its failure to increase its offer above $75,000 between December 2005 and September 2009.

(4)   Through its litigation strategy, by which it did not tender the full extent of its policy until September 28, 2009, three weeks before the scheduled trial date in the underlying litigation, New York Central acted in bad faith, in gross disregard of the interests of its insured and plaintiff as the excess carrier.

---

excess insurance carrier may recover from a primary insurer under section 349, and in my review of the applicable law, I have found none.  In large part, the cases I reviewed in which courts applied section 349 against insurance companies arose from claims by insureds.

54

(5)     New York Central also acted in bad faith by failing to conduct, or obtain from outside counsel, a thorough analysis of the Horton litigation and predicted jury verdict value in the event of a verdict in favor of Horton until late September 2009, only weeks from the trial date and days before it announced its intention to tender its policy limits.

(6)     As a direct and proximate result of New York Central's bad faith, it lost an actual opportunity to settle the Horton case, with no monetary exposure to Quincy Mutual or Warden in December 2005, at a time when all doubts regarding Warden's liability were removed.

(7)     As a direct and proximate result of New York Central's bad faith, Quincy Mutual was exposed to the full extent of its excess liability policy, and thereby suffered damages in the amount of $1,000,000.

(8)     Quincy Mutual's conduct, including its alleged failure to mitigate damages, did not contribute to the damage it suffered in this case because it had no duty to undertake a defense in the matter until New York Central, as the primary insurer, tendered is full policy limits.

(9)     Quincy Mutual is therefore entitled to recover damages from New York Central in the sum of $1,000,000.

(10)   Quincy Mutual is also entitled to recover prejudgment interest on the foregoing sum, calculated from January 1, 2006, until the entry of judgment, calculated at the rate nine percent per year.

(11)   At trial, Quincy Mutual did not satisfy its burden of proving that New York Central violated New York General Business Law § 349, and therefore is not entitled to recover attorney's fees.

V.   SUMMARY AND ORDER

Based upon the foregoing, it is hereby

ORDERED that plaintiff Quincy Mutual's motion *in limine* (Dkt. No. 46) is DENIED;

ORDERED that the clerk enter judgment in the action in favor of plaintiff Quincy Mutual Fire Insurance Co., and against defendant New York Central Mutual Fire Insurance Co., in the amount of $1,000,000, together with prejudgment interest from January 1, 2006, until the entry of judgment, calculated at the rate of nine percent per year.

Dated:   March 31, 2014
         Syracuse, New York


David E. Peebles
U.S. Magistrate Judge

56